Good morning all. Our first case this morning is the Illinois Department of Revenue v. Hanmi Bank et al. Mr. Newbold. May it please the court, my name is James Newbold. I represent the Illinois Department of Revenue v. Hanmi Bank. This court decided the Precision Industries v. Qualtech case, and although the case did not decide the issue of whether successor liability claims are interest, which can be extinguished when a sale is authorized under section 363 of the Bankruptcy Code, stands for two propositions that are relevant to these appeals. First, it decided that the term interest was to be given an expansive definition. And second, it made clear that a party holding an interest is entitled to be compensated for the value of its extinguished interest, and that the compensation will usually come from proceeds. In these cases, IDOR held a successor liability claim against each of the purchasers, as each of the sales met the criteria of a bulk sale under the state bulk sales provisions. So the issue then is how we Rather than discuss, forgive me, but rather than discuss cases that may or may not be relevant, would you talk about the fact that Judge Goldgar gave you, gave IDOR, the opportunity to put on evidence of the value of its interest, but as Judge Goldgar noted, IDOR essentially came forward with nothing. If you could help us with that, I think it would be more helpful than, as I say, some cases that might or might not be relevant. We proceeded at the hearing because we were hoping to convince Judge Goldgar that the purchaser was paying a significant amount extra because the sale was free and clear of our interest. We think that we did establish that there were additional assets. However, upon further review, we don't think it matters because we don't think that the correct test for valuing this interest is whether the purchaser has assets after the closing with which to Are you valuing IDOR's interest based on what would have occurred had the sale taken place outside of bankruptcy, or are you valuing it based on what value a buyer in bankruptcy would place on having IDOR's interest removed, or are you using some other approach? We're basing it the first way, the way that we would calculate it under the bulk sales provisions, and that is you take the taxes owed by the seller, and that is the amount that would be claimed up to a cap of the value of the assets sold. So we believe that that is the value since that is the amount that we require to be remitted to the department in order to get a release. Now then, let me ask you a question about the purchaser's purchaser only becomes personally liable for the unpaid taxes if it fails to give IDOR notice of the purchase and sets aside the funds that are necessary to cover the outstanding if the seller has not satisfied the tax liability, the buyer then has to turn over those withheld funds to the department on demand. Well, see, here's what I'm not getting, okay? How does the purchaser's personal liability figure into our analysis? Shouldn't we assume that the purchaser will comply with the bulk sale provisions? Outside of bankruptcy, absolutely. If they want to, well, they could do it one of two ways. They could withhold some of the funds in the manner as they did in the Hornstra case and turn it over to the department if the seller does not satisfy the tax liability. The other way would be they could assume the liability but just adjust their purchase price accordingly. Now bankruptcy has an overlay on that and if you accept the notion that a sale can be free and clear of this interest, then you, they don't have to go through this process. Instead, IDOR needs to come in and ask for adequate protection, which is what we did. But look, tell me why if these sales had taken place outside of bankruptcy, IDOR could realistically have expected to recover anything from the sales proceeds, given the liens that the banks had. The banks had these liens on these properties. Yes, under the bulk sale provisions, the purchasers would have been required to set aside funds that were sufficient to cover the unpaid taxes, but wouldn't the banks have had a first bite at those funds as Judge Barnes reasoned? Not if the funds were held pursuant to a condition preceding as the purchaser did in the Hornstra case. Otherwise, if they weren't held in such a fashion, the Bjork case says that the secured creditor could get at them. The seller has a sufficient interest for the liens to attach. Look, if IDOR's interests were the sole wanted issue, it might be a straightforward matter to place a value on removing that interest from the sale of the property. But of course, IDOR was not the sole entity. You know, the bank looms large. By virtue of its lien on the And when we look at the extent of the claim, all other interest holders, they were going to walk away penniless. And any intelligent, informed purchaser would be quick to realize that the interests of IDOR and the other creditors were essentially worth zero. And it's just very hard for me to get past that. If I may explain the dynamics of how this would happen outside of bankruptcy, I think it may illustrate. But we're in, you know, we're in bankruptcy. If the sale takes place outside of bankruptcy, the purchaser will not buy unless it can be free of this liability. So it has to account for that in one way or another. If the bank does not agree to a deal that would allow the IDOR to be paid, then the bank's other remedy is to foreclose. In a foreclosure, IDOR would not get paid. But what happens is that foreclosure sales result, almost always result in a whole lot less being collected. Foreclosure sales, almost always, not always, but almost always result in a smaller recovery than a going concern sale. So the bank would have to decide whether it would be economically wise for it to foreclose and forego some of this money. And claim. So somewhere between going concern value and foreclosure value would be room for negotiation if this took place outside of bankruptcy. Or if it took place inside of bankruptcy, but the sale was subject to the department's claim. Did I answer your Honor's question? Well, you answered it the way IDOR sees it. But I fear, and of course I need to hear the other side and probably reread everything yet again. But to me, as I sit here, IDOR seems to be looking at its right under the that had the sale taken place outside of bankruptcy, it would be able to collect all the taxes it was owed, you know, up to the full amount of the purchase price. But as Judge Barnes pointed out, in the Elk Grove Village case, even outside of bankruptcy, the bank, by virtue of its lien against the property, would have had a claim to the very same funds that the purchaser was required to set aside. And because the bank's claim was perfected in contrast to that of IDOR, the bank would have the first bite at those funds. And the amount of the bank's claim happens to have been greater than the purchase price. So the bank would be able to take all the money, and sadly, there's nothing left to pay IDOR. So anyway, dissuade me. I would submit, Your Honor, that that sale would never happen, because if IDOR still had a liability against the purchaser, and the purchaser refused to pay it, IDOR would be in a position to shut them down. It would be a tax owed by the purchaser, and IDOR's remedies are vast. I cannot imagine a responsible purchaser ever being in that position. I mean, in both of these cases, we have purchasers who wanted to make sure that they took care of these issues, and the way that these sales took place, they did exactly that. The problem that I have with the bank saying that all of these proceeds are theirs is that because the purchasers can take free and clear of IDOR's interest, they can bid more. They can what? They will bid more. They'll pay more for the assets if it's free and clear. Well, I don't see why that additional amount being paid should flow to the bank, when the reason that it is being paid is because property is being taken free and clear of IDOR's successful liability interest. Let me move on. I think you have covered much of what I was going to present. I would like to address just a few things. There's an argument made that this violates the bankruptcy priorities, and the Jevick case is cited, the Supreme Court decision in Jevick. The problem with that is the idea that secured creditors, and then they go down through the priorities, that that's how all payments have to be made in bankruptcy, oversimplifies what actually does happen in bankruptcy. In a bankruptcy case, administrative claims are going to be paid in the ordinary course during administration of the case, even before any secured claims are paid. There's another example. The estate can surcharge secured creditors collateral under section 506C to the extent it's provided a benefit, it's enhanced the value of that, and that money can be used to pay unsecured creditors. The rights that we seek to enforce here are granted us under the bankruptcy code. We think that 363E gives us a right to make a claim to the extent that we have enhanced the value and the sale price. Now we are not claiming it under 506C, but clearly the price is increased because it's free of our interest, and we think that that amount attributable, the increase in price- You're in your rebuttal time, you know. Yes. It should be given to the department. Just one question. What do you see in 363 that demonstrates any sort of congressional intent that state law priority rules be ignored when an interest is extinguished by 363F? I'm sorry, I- Well, I'm looking at the Javik case that you talked about. Yes. And it seems pretty clear that the Supreme Court wants a pretty strong statement from Congress if we're going to depart from the language of 363. I would submit the 360- well, 506C certainly is. I think 363E says that if you're having an interest extinguished, you're entitled to be compensated. Again, I think that we have increased the value and we should be compensated for that. Thank you. Mr. Dan? May it please the court. Jeffrey Dan on behalf of Eugene Crane, the trustee in the Elk Grove Village petroleum cases. We believe that this actually boils down to two simple issues here. The first is whether or not IDOR has a protectable interest, and the second, obviously, is would the payment to IDOR violate the priorities of bankruptcy code and the Javik case, which we've cited. The first issue about it, whether or not this is a protectable interest, as Judge Barnes stated in the Elk Grove case, IDOR's claim is really an in-co-aid claim that is not vested until the sale. That happened post-petition. That means that as of the petition date, they have a in-co-aid claim and does not become co-aid. And because of that, they're not entitled to protection under section 363. Wait, wait. Hold on for one minute. Why, can you explain why is IDOR's successor liability claim not an interest for both, for the purposes of both 363E and F? The bulk sale provisions grant IDOR this interest. I mean, I agree with you that it's an in-co-aid interest. And I'm not arguing that they don't have an interest. Necessarily only arises if and when there is a sale, but it strikes me as a cause of interest nonetheless. We don't deny that it's an interest. We're only saying that it is not a protectable interest because the fact that it is in-co-aid until the sale, which happened post-bankruptcy, that's why they're not entitled to the rights under section 363. But even forgetting that for a moment, they were given adequate protection by the order entered by Judge Barnes because they were granted, to the extent that they had a protectable interest, they were granted a right in the proceeds until Judge Barnes would then rule on the priorities, which gets into the more important question, which really arises from the Jevick case, that you have to follow the priorities of the bankruptcy code. It's clear from what the Supreme Court said in Jevick, and it's clear from the bankruptcy code. Secured creditors come first. After that, there's the succession of the line of bankruptcy through section 507. IDOR has not denied they are behind the bank as far as any liens and as far as what the priorities would be under the bankruptcy code. As Mr. Newbold had argued, they're talking about what would happen outside of bankruptcy, but as the court has stated, we weren't outside of bankruptcy. We were inside of bankruptcy, and as the Jevick court said, as the Supreme Court said, one of the cornerstones of the bankruptcy code is the priorities. If the court were to allow IDOR to be paid, it would basically turn bankruptcy on its head because you would now allow state legislatures to enact legislation around the bankruptcy code. Federal law preempts state law, and it's clear that you can't legislate around the bankruptcy code and make it meaningless. One of the issues that Mr. Newbold had raised is he specifically said they are not proceeding under 506C, and he said that there are other ways to pay other claims, administrative claims, during a case. However, that is done either with the consent of the secured creditor or if the secured creditor is adequately protected. That's the only way that the administrative claims would be allowed during the case. That's not the situation here because, as we all know, at least in the Yelp Grove case, there were $14 million in liens to the bank. They gave up their rights with those liens just as IDOR was, so the argument of IDOR that they should be compensated for giving up their right to seek successor liability, which they admit that they waived that right, how can you then say the banks giving up their right on a first-in-time, first-in-right, much higher lien is not entitled to value? In any event, everything really boils down to JAVIC and 507. You have to follow the priorities here, which IDOR is asking this court to ignore those priorities and essentially ignore the bankruptcy code, and that cannot be allowed. All right. Thank you, Mr. Dan. Ms. DeRose. May it please the court, Shelley DeRose on behalf of Hominy Bank, formerly known as United Central Bank. I want to start by addressing one of Mr. Newbold's comments about what would happen outside of bankruptcy, because outside of bankruptcy, let's face it, we're dealing with speculation at that point, but if we're going to speculate, I think it's fair to speculate that my client, who had $14 million in cross-collateralized secured liens against the property of these four debtors, would have filed for foreclosure in Illinois state courts. And under the foreclosure laws, and IDOR concedes this, the IDOR right to successor liability would be wiped out. So in the context of bankruptcy, I think I need to draw your attention to section 363F, which is the section that wipes out anyone with an interest claim in property pursuant to a sale. Now, my clients lost their rights to foreclose as part of that 363 sale. They lost, if you break it down, they lost their right to wipe out IDOR successor liability claim. So while IDOR successor liability claim was also wiped out, my client's right to wipe it out was wiped out, and I think it cancels each other out. And the equities of the case would say that my client is still in first priority regardless of what would have happened outside of bankruptcy, regardless of how IDOR speculates it would have, you know, happened outside of bankruptcy. Because our rights to wipe them out were also wiped out. Now, IDOR makes a point that part of the price the purchaser paid for the properties in these cases was consideration for IDOR's interest, or perhaps more accurately, consideration for removing IDOR's interest from the properties. It does seem to me that the buyers got something of real value by being able to buy the properties free and clear of IDOR's claim. So why shouldn't IDOR get something in return? Your Honor, a second, third, fourth, fifth, sixth, seventh, eighth secured creditor, priority secured creditor can make the same argument. Take, for example, a second priority secured creditor who would have priority over IDOR's interest, by the way, but was behind my client. Let's take that hypothetical, for example. They could make the argument that, Your Honor, if my second priority lien wasn't wiped out in the sale, the buyer wouldn't have paid as much as what it paid. And that would be true, right? If a second priority lien still hung around after the sale, presumably the price would go down. And so any junior creditor who's behind a first priority secured creditor can make the same argument. So I think it's a flawed argument. And there was no premium here, and I'll give you an example of why. Orland Park Petroleum, which is one of the debtors in the Elk Grove Village cases, the property was sold for $106,000. The IDOR taxes were $506,000. My client's liens on that property were $506,000. Remember, though, we had cross-collateralized, so it was up to $14 million. What IDOR is asking for in its briefs is that you find that the sale proceeds were not actually sale proceeds. That the proceeds that were received for Orland Park were 100% attributable to releasing the successor liability claim and 0% attributable to releasing the $1.5 million first priority secured lien on that property. So in other words, what IDOR is arguing is you didn't sell the property, you just sold the release of my successor liability rights, and the trustee effectively gave the property to the purchaser for nothing, for $0. If you look at the brief, that's exactly what they're trying to accomplish here. And it's really just this enhancement of purchase price theory is just a legal fiction they're trying to create that is not supported by the plain language of Article 9, Section 315, which says that security interest of a secure creditor proceeds in the proceeds. It's in contradiction to the plain language of the bankruptcy code under Section 552, which says the same thing. And so it's a fiction that they're trying to have this court read into the code that's just not there. Another point I wanted to, for talking about plain language, I wanted to draw to the court's attention is the acts upon which IDOR relies, these bulk sales acts, they actually use the language when a taxpayer sells the property. And in this case, in the Elk Grove Village case specifically, the taxpayer wasn't the one who sold the property, it was the Chapter 11 trustee. And IDOR, in its reply brief, tries to say that the trustee has the duty to stand in the shoes of a business owner and run the business like the business owner would. However, the plain language of the state laws say the word taxpayer, and the rules of construction under those same laws say you have to use the plain meaning of the word if it's apparent from the context. So in this case, the Chapter 11 trustee was appointed upon my client's motion. The property was taken away from the taxpayer. The taxpayer objected to the motion to appoint the Chapter 11 trustee. We had a full trial on it, and the court ruled that due to the taxpayer's mismanagement, a trustee was going to be put in place to run the property. So the taxpayer did not sell the property. So it really is more akin to a foreclosure where you have a third party selling the property, not the taxpayer itself trying to sell the property, and presumably the policy behind these bulk sales acts is so that the property owner doesn't sell the property, collect the sale proceeds, and run away without paying taxes. Now they twist the arm of the purchaser in order to accomplish that, but the policy behind that really wouldn't apply in a bankruptcy sale. Unless anyone has any further questions. Okay, thank you, Mr. Rose. Mr. Fisher? May it please the Court. My name is David Fisher, and I represent First Community Bank. I'd like to reinforce a few things that Mr. Rose alluded to, but also to go to the policy that would happen if this Court would adopt IDOR's position. What IDOR is essentially trying to get is a hidden priming link that would prime every secured creditor in every bankruptcy, and that secured creditor would have no idea until the bankruptcy unfolded or the sale how much its lien was primed. And as a result of that, any thoughtful secured creditor would immediately either get IDOR to concede at the start of any bankruptcy case that they had no claim, or a claim that the secured creditor was comfortable with or the secured creditor concluded that the assets were going to be sold far in excess of their debt, or what that secured creditor would be forced to do, I think, is to move to lift the stay and go to state court and articulate its rights there. In both of these cases, given that IDOR's position is that its entire tax liability, which by the way is arrived at pre-petition and would not be an administrative claim, is so large that the secured creditor would immediately go to the bankruptcy court, demand to lift the stay, because no reorganization would be possible, and every case would go to state court, and as a result, as Mr. Newbold suggested, the going concern values might be eroded, and as a result, I think all the employees would be harmed, and bankruptcy as we know it, any time that a state court lien that was sizable was out there, would just stop in its tracks and everything would change in a way that I don't think either the state of Illinois intended when that statute was written, or the bankruptcy code contemplates, and indeed, Judge Barnes in his footnote, when he talks about preemption, is absolutely right, and the state can't do this and make the federal remedies substantially worse than the state remedies, and I think Mr. Ruse was right, A, to focus on the plain language of the taxpayer really isn't selling. It's a different kind of forced sale, and the other point that I would make is that the free and clear language of the orders also makes it free and clear of the secured creditor's interest in liens, and if IDOR's interest continues, so would the secured creditor's, and therefore, what would happen following IDOR's logic would be that the purchaser would set the money aside under both Hoonstra and Bjork, the bank's lien, if it was a properly perfected lien, would continue, would stay on those proceeds, and then the purchaser would wind up is eliminate that unnecessary step, and I know IDOR has suggested somehow that the purchaser couldn't interplead, but I really couldn't see how those cases were persuasive that they couldn't, and indeed, both Hoonstra and Bjork are interpleader cases, and I think this court in both Bjork and Hoonstra is that in Hoonstra, there was no lien ahead of IDOR, whereas in Bjork, there was, but the holding is the same. Hoonstra absolutely confirms Bjork, and that's what you'd have here, so rather than create this, I would say, silliness that the purchaser holds the money, secured creditor claims a lien, and then there's some sort of interpleader, it ought to just go the way these cases were structured and these sales were structured, and that's all I had, unless. All right, thank you, Mr. Fisher. Mr. Newbold. Four. Getting back to this idea of the priorities under JEVC. In JEVC, there was no question about successful liability, there was no question about rights granted under the Bankruptcy Code, subsection E of 363, so to suggest that this is controlling on that, I understand the importance of the priority scheme. As a matter of fact, the Illinois filed an amicus brief in the case, but we have the rights under 363, that's all we're seeking. Now, Mr. Roos says that they had the right to foreclose, have a stay lifted, take it out. We don't disagree. But there's a cost to them. I mean, if they want to do that, that's fine. We recognize that if they had foreclosed, but the high likelihood is that they would not have realized anywhere near the $5.8 million gross in Elk Grove, and if they had done a state foreclosure in Naperville, it's my understanding that those were leased premises. For them to have realized the $2 million that was realized in the bankruptcy sale, I suspect, would have been highly unlikely. I don't profess to be an expert in appraisals, but my experience is that through a bankruptcy process, frankly, tend to get much higher prices, and they get much higher prices in part if they can sell free and clear of our interest. Now, Mr. Roos makes this argument that the trustee is not the taxpayer. I'm going to have to beg to differ because Mr. Crane, the trustee, I will guarantee you, filed every single tax return that was outstanding during his administration of the estate and he paid those taxes. So the suggestion that somehow he's not the taxpayer and therefore is not subject to the Illinois revenue statutes, I would submit is incorrect. Of course, that doesn't really advance anything, does it? Whether or not he's the taxpayer or not the trustee. Well, they're suggesting that the bulk sales provisions don't even apply because it was not a sale by a taxpayer. I submit that they do. Mr. Fisher spoke of the policy concerns. Well, the inequities that would happen if IDR enforces this right in bankruptcy cases. I have two responses to that. Number one, we do this outside of bankruptcy. I don't see why. I mean, this is the department's policy, and frankly, we negotiate a lot of these with banks. I told you what the dynamics were. If it's in the department's best interest, we oftentimes will compromise. And then he's talking about the interpleader and suggesting that under Hornstrom and Bjork are basically the same cases. They're not. In Bjork, first of all, the money was not interpled by the buyer. It was interpled by the buyer's lawyers in both cases. And they were truly disinterested holders of the fund. But in Bjork, because the money was not turned over to the department, the purchaser remained liable. We would ask that the court reverse the decisions of the bankruptcy court and remand for entry of orders for the banks to remit the department's plans. Thanks to all counsel. Thank you.